## Case No. 7,124.

### In re JACKSON.

[14 Blatchf. 245.] [1]

Circuit Court, S. D. New York.　June 9, 1877.

Abram J. Dittenhoefer, for relator.

Benjamin B. Foster, Asst. Dist. Atty., for the United States.

BLATCHFORD, District Judge. On the 8th of March, 1877, a United States commissioner for this district issued a warrant to the marshal, which recited, that complaint on oath had been made to him, charging that A. Orlando Jackson did, on or about the 23d of February, 1877, "at the Southern district of New York, unlawfully, wilfully and knowingly deposit and cause to be deposited, in the post-office and mails of the United States, then and there, for mailing and delivery, certain circulars concerning lotteries," and commanded him to apprehend said Jackson. Jackson was arrested under this warrant, and brought before the commissioner on the 13th of March, and was identified as the party charged, and discharged on bail to await trial. Subsequently he was surrendered by his surety, and he demanded an examination before the commissioner on the charge, and it was had, and the commissioner, on the 2d of May, decided that there was probable cause to believe that Jackson committed the offence charged, and he committed him to the custody of the marshal, to await the action of the grand jury, in default of $500 bail. Thereupon he has been brought before this court on a writ of habeas corpus issued to inquire into the cause of his imprisonment, and the proceedings which took place before the commissioner have been brought before this court by a writ of certiorari. It appeared before the commissioner, that Jackson, on the 23d of February, 1877, deposited in the post-office at New York City, to be conveyed by mail, a sealed letter envelope, addressed as follows: "J. Ketcham, Lock Drawer 164, Gloversville, N. Y.," and which contained circulars concerning a lottery described as "The Kentucky State Lottery, Simmons and Dickinson, Managers," and also circulars concerning Louisiana and Havana lotteries, the postage on which was duly prepaid by stamps, and that the above named lotteries were authorised by the laws of the respective states of Louisiana and Kentucky and of the kingdom of Spain.

The prosecution in this case is founded on section 3894 of the Revised Statutes, which, as amended by section 2 of the act of July 12, 1876 (19 Stat. 90), provides, that "no letter or circular concerning lotteries, so called gift concerts, or other similar enterprises, offering prizes, or concerning schemes devised and intended to deceive and defraud the public, for the purpose of obtaining money under false pretences, shall be carried in the mail;" and that "any person who shall knowingly deposit or send anything to be conveyed by mail, in violation of this section, shall be punishable by a fine of not more than five hundred dollars, nor less than one hundred dollars, with costs of prosecution." The amendment of 1876, consisted in striking out the word "illegal" before the word "lotteries" from the section as originally enacted in the Revised Statutes. A part of the statutory provision embodied in section 3894 of the Revised Statutes was originally enacted July 27, 1868, as section 13 of the act of that date (15 Stat. 196), in these words: "It shall not be lawful to deposit in a post-office, to be sent by mail, any letters or circulars concerning lotteries, so called gift concerts, or other similar enterprises, offering prizes of any kind, on any pretext whatever." No specific penalty or punishment was imposed for a violation of this provision. On the 8th of June, 1872, it was enacted as follows, by section 179 of the act of that date (17 Stat. 302): "It shall not be lawful to convey by mail, nor to deposit in a post-office to be sent by mail, any letters or circulars concerning illegal lotteries, so called gift concerts, or other similar enterprises, offering prizes, or concerning schemes devised and intended to deceive and defraud the public, for the purpose of obtaining money under false pretences, and a penalty of not more than five hundred dollars, nor less than one hundred dollars, with costs of prosecution, is hereby imposed, upon conviction, in any federal court, of the violation of this section." It is to be noted, that the word "illegal" was not in the act of 1868, but was inserted in the act of 1872,

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

and continued in the Revised Statutes, and stricken out by the act of 1876.

Congress has, at various times, exercised the power of excluding from the mails various articles, capable of being conveyed in sealed letter envelopes, and of declaring it to be a punishable offence to deposit such articles in the mail. By section 148 of the act of June 8, 1872 (17 Stat. 302), it was enacted, that no obscene book, pamphlet, picture, print, or other publication of a vulgar or indecent character, shall be carried in the mail, and that any person who shall knowingly deposit for mail or for delivery any such obscene publication, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall, for every such offence, be fined not more than $500, or imprisoned not more than one year, or both, according to the circumstances and aggravation of the offence. By section 2 of the act of March 3, 1873 (17 Stat. 599), such inhibition was extended to every "obscene, lewd, or lascivious book, pamphlet, picture, paper, print, or other publication of an indecent character," and to every "article or thing designed or intended for the prevention of conception or procuring of abortion," and to every "article or thing intended or adapted for any indecent or immoral use or nature," and to every "written or printed card, circular, book, pamphlet, advertisement or notice of any kind, giving information, directly or indirectly, where, or how, or of whom, or by what means, either of the things before mentioned may be obtained or made;" and it was enacted, that any person who shall knowingly deposit, or cause to be deposited, for mail or delivery, any of said articles or things, or any notice or paper containing any advertisement relating to said articles or things, and any person who, in pursuance of any plan or scheme for disposing of any of said articles or things, shall take, or cause to be taken, from the mail, any such letter or package, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall, for every offence, be fined not less than $100, nor more than $5,000, or imprisoned at hard labor not less than one year, nor more than ten years, or both, in the discretion of the judge. These provisions were re-enacted in section 3893 of the Revised Statutes, and by section 1 of the act of July 12, 1876 (19 Stat. 90).

It is contended for the relator, that, if section 3894 can be construed to cover sealed letters, it is void, as not within any power conferred on congress by the constitution. The argument is, that, prior to the adoption of the constitution, which conferred on congress (article 1, § 8) the power "to establish post-offices and post-roads," the states and the people had enjoyed for many years the right of having conveyed by post all sealed letters, without reference to their contents, (unless such contents were liable to destroy, deface, or otherwise injure the contents of the mail-bag, or the persons of those engaged in the postal service, such as liquids, poisons, glass or explosive materials); and that such grant of power must be construed as not authorizing congress to exclude from the mail what was legitimate mail matter at the time of the adoption of the constitution. It is further said, that congress is bound to provide for carrying by mail everything which it prohibits from being carried otherwise than by mail; and that it has made it a punishable offence to carry letters for hire outside of the mail. It is further said, that the exercise of a power absolutely to prohibit the carrying in the mail of sealed letters containing information of a certain character, is not the exercise of a power which is either proper or necessary for carrying into execution the power of establishing post-offices and post-roads; that a power of exclusion, based upon the contents of sealed letters, is an arbitrary power, and may be extended to the exclusion of matters which depend on caprice or whim; and that the exclusion, in the present case, extends to matters which are lawful under the laws of some of the states of the Union, and to matters over which the federal government has no jurisdiction.

On the part of the United States it is contended, that it is within the constitutional power of congress to determine what shall be mail matter; and that, in pursuance of such power, it may lawfully exclude certain articles and things from the mail, although such articles and things are contained in sealed envelopes, and may declare it to be an offence to deposit such articles and things in the mail.

The meaning of the clause in the constitution (article 2, § 8), that congress shall have power "to make all laws which shall be necessary and proper to carry into execution the foregoing powers," has been settled by judicial construction. It does not mean that no law is authorized which is not indispensably necessary to give effect to a specified power. Congress possesses the choice of means, and is empowered to use any means which are in fact conducive to the exercise of a power granted by the constitution. U. S. v. Fisher, 2 Cranch [6 U. S.] 358, 396. The necessity spoken of in the clause is not to be understood as an absolute one, but congress is to be allowed that discretion with respect to the means by which the powers conferred on it are to be carried into execution, which will enable it to discharge the high duties assigned to it in the manner most beneficial to the people. If the end is legitimate and within the scope of the constitution, then all means which are appropriate, and are plainly adapted to that end, and are not prohibited, but consist with the letter and spirit of the constitution, are constitutional; and, if a particular law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, an inquiry by

a court into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 421, 423; Legal Tender Cases, 12 Wall. [79 U. S.] 539.

The principal argument on the part of the relator is, that, inasmuch as the exclusive power is given to congress to establish post-offices and post-roads, it is not authorized to refuse to carry in the mail anything which was lawful mail matter at the time the constitution was adopted. This line of reasoning has been sought to be applied to other matters of federal cognizance, but has not met with favor. Thus, congress is authorized to establish uniform laws on the subject of bankruptcies throughout the United States; and it has been contended, in respect to laws on that subject which have been enacted by congress, that the power of congress is limited to the principle on which the English bankruptcy system was founded when the constitution was adopted, and cannot extend to authorizing voluntary bankruptcies, or to putting into involuntary bankruptcy others than traders, or to granting discharges without the consent of creditors, or to authorizing such compositions as are now provided for. But the view has prevailed, that congress, in passing laws on the subject of bankruptcies, is not restricted to laws with such scope only as the English bankruptcy laws had when the constitution was adopted, and that it is sufficient if the statute relates to the subject of bankruptcies. In re Klein, 1 How. [42 U. S.] 278; In re Silverman [Case No. 12,855]; U. S. v. Pusey [Id. 16,098]; In re Reiman [Cases Nos. 11,673, 11,675]. So, also, in respect to admiralty and maritime jurisdiction. The constitution declares (article 3, § 2) that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction. Prior to the decision in the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, it had always been understood and held, that, under the constitution, such jurisdiction was confined to tide-waters. In that case it was held, that, according to the true construction of the grant in the constitution, the admiralty jurisdiction extended to all public navigable waters, whether influenced by the tide or not. In England, in the text-writers and the decisions, the jurisdiction of the admiralty had always been spoken of as confined to tide-water, tide-water and navigable water being, in England, synonymous terms, and "tide-water" meaning, in England, nothing more than public rivers, as contradistinguished from private ones. At the time the constitution was adopted, and our courts of admiralty went into operation, the English definition of the jurisdiction, that it was confined to the ebb and flow of the tide, was adopted here, by the courts. But it afterwards became evident, that a definition which would limit public rivers in this country to tide-water rivers was utterly inadmissible, and it was held that the lakes and the waters connecting them were public waters and within the grant of admiralty and maritime jurisdiction in the constitution.

These illustrations serve to show, that, in construing a grant of power in the constitution, it is to be construed according to the fair and reasonable import of its terms, and its construction is not necessarily to be controlled by a reference to what existed when the constitution was adopted. A power to establish post-offices and post-roads is executed by the single act of making the establishment; but, under such power, it has always been held to be lawful to carry the mail along the post-road, from one post-office to another, and to punish those who steal letters from the post-office or rob the mail. So, under the power to establish post-offices and post-roads, it must be held, that congress has the right to prescribe what it will carry along the post-road as part of the mail, and what it will not carry, and to render its enactments efficient by punishing as an offence the violation of them. Whether certain things shall be excluded or not is a matter for the sound discretion of congress, and the discretion of a court cannot be substituted for the discretion of congress. The discretion of congress cannot be fettered by the consideration that a given thing was generally or even universally allowed to be carried in the mail when the constitution was adopted. To argue against the existence of such discretion because it is possible for congress to abuse its exercise, by excluding from the mail letters. containing matter of a given character, through caprice or from partisan prejudice, is to argue against the existence of all discretion in congress in the exercise of any of the powers conferred on it. All such discretion may be abused, but the correction of the abuse must be left, under our form of government, to the expression of the will of the people by means of the elective franchise. The existence of the abuse is no argument against the existence of the power. Because an individual judge might not, if a legislator, have thought it wise to exclude from the mail a sealed letter containing matter of a given character, it is not for him, in the exercise of his judicial functions, to hold that such exclusion is not within the constitutional authority of congress. Whether the provisions of law which forbid and punish the carrying of letters outside of the mail will be construed as applying to letters which congress forbids to be carried in the mail, is a question which does not arise in this case.

It is, undoubtedly, not indispensably necessary to the exercise of the power of establishing post-offices and post-roads, that letters or circulars concerning lotteries should be excluded from the mails. But congress is not prohibited from excluding them, and, if congress regards it as most beneficial to

the people, and as calculated to effect in the most proper manner the objects of establishing post-offices and of carrying the mail, to exclude from the mail letters concerning lotteries, whether legal ones or illegal ones, it is for congress, and not for a court, to judge of the degree of necessity for such exclusion.

It is also contended, for the relator, that section 3894 of the Revised Statutes does not create any crime or offence against the United States. This is not so. The word "punishable," and the fact that the amount of the fine imposed is discretionary, indicate that a crime is intended and not a pecuniary penalty to be recovered by a civil action.

It is further urged, that, because the only punishment is a fine, and there can be no imprisonment except for the nonpayment of the fine, the relator cannot be arrested and deprived of his liberty in the first instance. But section 1014 of the Revised Statutes provides, that, for any crime or offence against the United States, the offender may be arrested, and imprisoned or bailed, for trial. If there be a crime or offence, an arrest for trial may be made, to be followed by imprisonment if no bail is taken, or by bail, even though the punishment, on conviction, be a fine alone. The arrest is made to secure a trial for the offence.

The writ is dismissed, and the relator is remanded to the custody of the marshal under the process of commitment by which he was held.